## W. W. THOMAS v. I. L. WOLFE.

### Delivered April 8, 1897.

**1. Public Lands—Isolated Section—Burden of Proving Isolation.**

One settling upon a section of school land and applying to purchase the same after it had been sold by the State as an isolated section to one not an actual settler thereon, has the burden of showing that such land was not isolated, and that the attempted sale was unlawful.

**2. Same—Same—Bona Fide Purchaser Protected.**

A purchase of a section of school land in good faith as an isolated section by one not an actual settler thereon, in reliance upon its situation as such as shown by the public maps and records of the General Land Office at the time of the sale, will be held valid, although the land was not in fact isolated from other public lands.

**3. Same—Same—Isolation After Passage of Act.**

A section of school land was subject to sale to others than actual settlers, where such section became isolated and detached after the passage of the Act of April 1, 1887. Section 22, Laws 1887, p. 90.

APPEAL from Harris. Tried below before Hon. S. H. BRASHEAR.

*G. H. Pendarvis,* for appellant.

No brief for appellee reached the Reporter.

WILLIAMS, ASSOCIATE JUSTICE.—Appellee instituted this suit for the purpose of securing a cancellation of a contract between appellant and the State, under which appellant had purchased, without actual settlement, but as being isolated and detached from other public lands, a section of school land, and to establish his (appellee's) own claim to the same land arising from an actual settlement upon and application to purchase it, made in compliance with the law. Appellee's claim is admitted to be junior in date to that of appellant, but is asserted to be the better one, for the reason alleged that the land was not isolated and detached from other public lands, and therefore not subject to be sold to any person but an actual settler. Appellant pleaded the general denial, not guilty, and in reconvention to establish his own claim and to recover possession.

The facts upon which the rights of the parties depend are as follows:

The section of land in controversy had been surveyed and appropriated to the school fund, and all preliminary steps necessary to empower the Commissioner of the General Land Office to sell it under the Act of April 1, 1887, and amendment thereof of April 8, 1889, had been taken prior to March 19, 1891. On that date Griffin Wilgus made application to purchase it as a section isolated and detached from other public lands, under the twenty-second section of the two acts, and complied with all the requirements of the statute applicable to that kind of a sale, without having become an actual settler upon the land; and the section was sold to him by the Commissioner in conformity with the statute.

Some time during the year 1892 the county surveyor of Harris County certified to the existence and field notes of a strip of vacant and unappropriated public land, adjoining the section in controversy at its southeast corner, which strip so certified was sold by the State, under the provisions of the "Scrap Land Act," and was on October 31, 1892, duly patented to M. E. Friedenhaus. Except as to said strip so certified to and sold and patented, the section of land in controversy was at the date of the sale to Wilgus entirely detached and isolated from other public lands. This is the only evidence in the record tending to show that at the date of the sale to Wilgus the land was not isolated.

On August 5, 1893, W. W. Thomas, the defendant herein, tendered to the Commissioner of the General Land Office a duly authenticated transfer of the section of land in controversy from Griffin Wilgus to W. A. McGuire, and a duly authenticated transfer of the same land from W. A. McGuire to W. W. Thomas, which transfers had been duly recorded in the office of the county clerk of Harris County. At the same time Thomas filed with the Commissioner his own application, affidavit, and obligation, as required by the statute to secure the substitution of one purchaser for another. No point in the case being raised upon the contents of any of these documents, but the decision depending on other questions, it is thought to be unneccessary to set them forth more fully.

The said papers so tendered by said Thomas were duly accepted by

said Commissioner and filed in his office on said 5th day of August, 1893. Thereafter the said Thomas paid to the Treasurer of the State the interest due on said purchase on the 1st day of August of the years 1893 and 1894, and the purchaser's account on the books of the General Land Office was in good standing at and subsequent to the date of the filing of this suit.

On or about December 8, 1893, one J. V. Nicholas settled upon the section of land in controversy and built a house thereon. About the time of making his settlement on the land, Nicholas made application to purchase the land from the State as an actual settler, forwarding to the Commissioner of the General Land Office his application, affidavit, and obligation in proper form as required by law, and also forwarded to the State Treasurer one-fortieth of the purchase price. The application of Nicholas was rejected by the Commissioner, on account of the prior sale of the land to Wilgus, and the money paid by him was returned to him by the State Treasurer.

On January 29, 1894, Nicholas conveyed his interest in the land to I. L. Wolfe, the plaintiff herein, and delivered to him the possession of the land. Wolfe immediately took possession and made some further improvements, fencing, breaking land, planting trees, etc. Wolfe was a married man, but up to the date of the trial he had not removed his family to the State of Texas, it being his intention to do so as soon as he had a home for them on the land in controversy. Wolfe continued to occupy the land as his home from the date of the purchase from Nicholas to the date of the trial. Wolfe never filed his transfer from Nicholas in the Land Office, and there was no evidence that he had ever made any application to the Commissioner of the General Land Office to purchase the land, or any tender of purchase money to the State.

The court below, upon these facts, held that the land is not, and was not at the date of the sale to Wilgus, detached and isolated from other public lands; that it was not subject to sale, except to actual settlers; that the plaintiff was an actual settler within the meaning of the law, and that, defendant having acquired no right by the purchases under which he claimed, plaintiff was entitled to the judgment for which he prayed, which was accordingly rendered.

We have heretofore held, where such a contract of sale under this statute has been concluded between the State, through its Commissioner, and a purchaser, in which the land is treated and sold as a detached section, that one subsequently settling upon and applying to buy the land had the burden of proof to show that such land was not detached and that the attempted sale was unlawful. Eastin v. Ferguson, 4 Texas Civ. App., 645. Such we believe to be the correct rule, especially in a case like this, where the subsequent settler brings his action for an affirmative decree annulling the contract of the prior purchaser and canceling the claim asserted under it.

We think the evidence in the statement of facts is insufficient to warrant the finding of the court that, at the date of the sale to Wilgus, the

section in controversy was not, as the Commissioner held it to be, isolated and detached, in the sense of the twenty-second section of the statutes referred to. Laws 20th Leg., p. 90; Laws 21st Leg., p. 53. By that provision all sections, wherever situated, which "are detached and isolated from other public lands," were offered for sale.

The State has always required to be kept in the General Land Office, and in the several counties, maps and records intended to exhibit the location of the various tracts of land in such counties, whether appropriated or belonging to the public domain. Those maps have indicated the situations and relation to each other of lands granted to persons, of those surveyed for and reserved to the various funds and purposes defined in the laws, and of those remaining unappropriated and constituting the public domain. An inspection of them would at any time indicate to a purchaser and to the officers of the State the status of any particular tract of land, as it was recognized and treated by the department of the government to which such matters are intrusted. And by these evidences all parties would necessarily be controlled in determining, as required by this statute, the situation of a section of school land and its relation to surrounding tracts, and in deciding the question whether or not that situation was such as to empower the Commissioner to sell it as detached and isolated from other public lands.

With these maps in existence showing these facts, and showing how the officers of the State recognized and treated the land as delineated on them, the Legislature passed this law offering for sale the sections of land belonging to the several funds named in it which "are detached and isolated from other public lands." We think that it should be held that the offer of sale was made with reference to the facts thus recognized and represented to exist, and that, when such offer has been in good faith accepted and complied with by the purchaser upon the same assumption, the validity of the sale should be made to depend upon the facts thus ascertained, and not upon others subsequently developed. Certainly if, by the means adopted by the State to ascertain and show the location and surroundings of its lands, a section is made to appear to be detached and isolated, and the purchaser, in good faith, acts upon such showing, it can not be assumed that the Legislature intended so unjust a result as that, upon a subsequent discovery that an error was committed in the mapping and location of the lands and the adjacent surveys, the sale is to be treated as unlawful.

A purchaser, under this statute, must doubtless look to the situation of the land as it appears upon the records which the State has made, and if it thus appears not to be disconnected, as required by the act, he must take notice of the want of power in the Commissioner to sell it. But, in adopting this provision, the Legislature must have intended that some practicable means of ascertaining the situation of the sections of land, with reference to other public land, should be used by its agents, and no other means could have been contemplated than the maps which the State had caused to be kept. It results that there must have been the

intention that the power given the Commissioner to sell isolated sections should be determined from the facts thus evidenced.

Against the presumption in favor of the legality and regularity of the act of the Commissioner nothing is shown, except that, after the sale to Wilgus, the county surveyor certified that a strip of land, touching the section in question at one of its corners, belonged to the public domain, and that it was sold and patented as public land by the Commissioner. Waiving the question whether or not such action of the officers, taken, as it was, after the sale to Wilgus, is sufficient, as against the presumption in favor of the validity of the sale, to prove that the strip was in truth part of the public domain, we think it is not sufficient to prove that, in the sense explained, the section was not detached and isolated when the sale was made.

It has been by no means infrequent, as is well argued by counsel for appellant, that strips of land, which had been supposed by the officers of the State and shown by the maps and records to be included within surveys of appropriated lands, have been found to be not so included, but to belong in fact to the State. The natural inference from the statement in the record is that such was the case here. Nothing is shown as to the dimensions or character of the strip, nor as to how it was treated and recognized at the time the sale was made to Wilgus. It is true that if it was public land in 1892, it was public land when the sale was made; but, by the evidence which the Commissioner and the purchaser had to guide them, it may have appeared to be otherwise. We think, before such a sale can be declared invalid, the facts existing when it was made must be shown.

But if the sale to Wilgus were treated as invalid, because the land was not then detached and isolated, it still remains to determine whether or not it was so at the time when appellant purchased, and if so, whether or not the procedure taken by him was not sufficient, under the law, to invest him with the right to it. The adjoining strip had then been sold by the State, and had ceased to be public land. Faulk v. Byerly, 37 S. W. Rep., 984.

While appellant sought to acquire the land as purchaser under Wilgus, he also took the steps required to substitute himself as purchaser from the State, and those steps involved the doing of all that an original applicant is required to do, in purchasing such lands, except the act of forwarding the cash payment. This amount had been previously paid by Wilgus, and the conveyance of his claim to appellant entitled the latter to the benefit of it. The money was in the hands of the officers of the State, and appellant's right to appropriate it as a payment on the land was evidently acknowledged by them, as the record recites that he was recognized as a purchaser in good standing when the suit was brought. We can not see that anything is wanting to a valid purchase by him, if, under the statute, lands which became isolated and detached after its passage could be sold by the Commissioner to others than actual settlers.

No brief has been filed by appellee, but appellant's counsel has referred

us to the decision of the Supreme Court in the case of Garrett v. Weaver, 70 Texas, 463, stating that it influenced the opinion of the court below in the decision of this point against him, and has presented an argument by which he seeks, and we think successfully, to distinguish the point there decided from that now before us. That decision construed the Act of July 14, 1879 (Gen. Laws, Special Session, p. 48), by which all unappropriated lands in named counties, all unappropriated lands within the Pacific reservation, and all such separate tracts of unappropriated public lands, situated in organized counties, as "contained not more than six hundred and forty acres" were set apart and offered for sale at 50 cents an acre. The offer for sale was not of all the public lands, nor all of the school lands in the State, but of specified portions; and, of course, none but those falling within the language of the specification when it was made could be sold under its provisions. Accordingly, it was held that, where a tract of public land which contained more than 640 acres at the date of the act, and which was not within any of the counties named, nor in the Pacific reservation, was reduced by appropriations made subsequent to the taking effect of the law to a quantity less than 640 acres, the remnant was not subject to sale. Plainly, this was because it had not been offered for sale by the terms of the act.

The statutes of 1887 and 1889 are of a very different character. They establish a permanent scheme for the sale of all the school, university, and asylum lands, for the purposes both of promoting the settlement of the State and the raising of funds for the support of the several institutions. Sales are required to be made to actual settlers only, except of lands such as "are detached and isolated from other public lands," which are permitted to be sold to any purchaser but corporations. In mentioning these lands, the statute uses the present tense, but in view of the scope and purpose of the law, and its other provisions, we think it should be held that this language has reference to the situation of the land at the date of sale.

The first section provides that "all lands heretofore or hereafter surveyed and set apart for" the purposes named "shall be sold and leased under the provisions of this act." It thus makes subject to all its provisions about sales, lands then already designated as belonging to the named funds, and all to be subsequently designated, and shows that its purpose is not to make the power to sell depend on the then existing status of such lands. One of the provisions under which the sales are thus to be made is that contained in the twenty-second section of the act. There is nothing in the whole statute to indicate that the power of the Commissioner to sell detached and isolated sections is to exist only with reference to those sections which were so situated at the date of the act, but we think the clear intendment is that the power to sell such sections, like the power to lease or sell to actual settlers the lands not isolated, is a continuing one, arising whenever the conditions upon which it is to depend shall be found to exist.

Our conclusions are: (1) That the question whether or not sections of

these lands are to be considered as isolated and detached is to be determined from their situation as they are represented and recognized upon the public maps at the time of the sale.

(2) That sections which, by sale or other appropriation to private persons of public land which adjoined them at the date of the statute, thereafter become isolated and detached are subject to sale, under the twenty-second section of the act, to others than actual settlers.

Under the first conclusion, the judgment is not warranted by the evidence, and the judgment would have to be reversed; and, under the second conclusion, appellant appears conclusively to have the better title, and judgment should be rendered in his favor by this court for the land.

*Reversed and rendered.*